# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **RANDALL C. BUTLER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | 1:05CV1136 |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by Defendant United States of America. (Docket No. 37.) Plaintiff Randall Butler has filed a response in opposition to the motion (Docket No. 39), and Defendant has filed a reply brief. (Docket No. 40.) The Court heard oral argument on November 18, 2009, and instructed the parties to file a joint report regarding the effect, if any, of a related case upon the present action. (Docket No. 43.) The parties filed that report on January 19, 2010. (Docket No. 44.) For the reasons stated herein, the Court now concludes that Defendant's motion for summary judgment should be granted, and this action should be dismissed for lack of subject matter jurisdiction.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of a traffic stop on February 23, 2002 made by Plaintiff Butler, an on-duty Moore County, North Carolina sheriff's deputy, on the truck in which two United

States soldiers were riding. (Docket No. 1, Complaint ("Compl.") ¶ 7; Docket No. 39, Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. F, Deposition of Plaintiff Randall Butler.) Ultimately, after various events which are in dispute, Plaintiff Butler shot both soldiers. (Docket No. 39, Ex. F.) One soldier, Sergeant Stephen Phelps, survived, but the other soldier, First Lieutenant Tallas Tomeny, succumbed to his injuries. (Compl. ¶ 15.) The soldiers were participating in an official Army exercise known as "Robin Sage" at the time they were shot. (*Id.*)

Plaintiff Butler brought this action to recover for his personal injuries under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671-80. (Compl. ¶ 1.) Plaintiff asserts that he discovered that the soldiers were participating in Robin Sage only after the shooting. (*Id.* ¶ 16.) Plaintiff further claims that the Defendant and the United States Army were negligent in planning and conducting the Robin Sage operation by: (1) failing to notify, inform, and brief local law enforcement authorities, including the Moore County Sheriff's Department, that the Robin Sage exercise would be conducted in their jurisdictions; (2) failing to notify and inform local law enforcement authorities, including the Moore County Sheriff's Department, of the unclassified operational details of the Robin Sage exercise which would be necessary for law enforcement authorities to recognize the Robin Sage participants, to facilitate the safe conduct of that operation, and to eliminate any possible confusion of real world activity and role play; (3) failing to properly train and advise exercise participants in the proper means and methods of dealing with encounters with non-exercise civilians and

non-exercise law enforcement personnel such as Plaintiff; and (4) failing to establish and brief non-exercise law enforcement contact procedures to all personnel in the exercise. (*Id*. ¶ 18.)

Plaintiff alleges that he suffered severe emotional distress and post-traumatic stress disorder which he would not have suffered if Defendant had properly planned and conducted the Robin Sage exercise. (*Id*.) Plaintiff also alleges that the United States Army denied his administrative claim for $5,000,000.00 on June 22, 2005. (*Id*. ¶ 24.) In this action, Plaintiff seeks compensatory damages in that amount, in addition to the costs of this action and attorney's fees. (Compl. at 10.)

## II. DISCUSSION

### A. Standard of Law

The parties construe Plaintiff's Complaint to raise two grounds for relief: an FTCA claim and a claim of negligent infliction of emotional distress under North Carolina law. (Docket No. 38, Def.'s Mem. in Supp. of Mot. for Summ. J.; Docket No. 39, Pl.'s Resp.) Defendant argues that although it filed a motion for summary judgment, the Court should analyze the FTCA issue as it would on a motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(1). (Docket No. 38 at 6). Defendant also argues that Plaintiff's claim of negligent infliction of emotional distress under state law should be dismissed under Fed. R. Civ. P. 12(b)(6) because it fails to state a claim upon which relief may be granted. (*Id*. at 18-19.)

The basis for Defendant's argument for dismissal of the FTCA claim is that the discretionary function exception of the FTCA should apply, thereby depriving this Court of jurisdiction over the claim. (Docket No. 38 at 1.) The Fourth Circuit has held that the proper practice is to dismiss for want of jurisdiction for purposes of the FTCA under Fed. R. Civ. P. 12(b)(1) if the discretionary function exception applies. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995); *see also Kerns v. United States*, 585 F.3d 187, 196 (4th Cir. 2009) (*Williams* applies and Rule 12(b)(1) analysis proper when threshold issue, such as whether discretionary function exception bars suit, is wholly unrelated to basis for liability under FTCA). Therefore, the Court will analyze the FTCA claim under Rule 12(b)(1). "The plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1)." *Williams*, 50 F.3d at 304. In ruling on a Rule 12(b)(1) motion, the court may consider exhibits outside the pleadings and is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Id*.

**B.** **Analysis**

    **1.** **Federal Tort Claim Act and the Discretionary Function Exception**

The FTCA is a waiver of the sovereign immunity of the United States. *Hawes v. United States*, 409 F.3d 213, 216 (4th Cir. 2005). The Act permits the government to be liable in tort generally as would a private individual. *Id*. However, the FTCA is subject to a number of exceptions, one of which is the discretionary function exception. *Id*. This exception excludes from the Act's waiver:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

A two-part test is used to determine whether the discretionary function exception applies. *Hawes*, 409 F.3d at 217. The test asks first whether the challenged governmental conduct involves an element of judgment or choice. *Id*. The primary question on this first element is whether the challenged conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action. *Id*. Where there is such a statute, there is no discretion and therefore no exception because the government employee has no rightful option but to follow the directive. *Id*.

If there is "an element" of discretion involved, the court turns to the second part of the test and determines whether the judgment is based on considerations of public policy. *Id*.; *see United States v. Gaubert*, 499 U.S. 315, 323 (1991). The actual considerations of the government agent are not relevant; the question is whether the actions are "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. A court is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which the court would expect to be grounded in considerations of policy. *Hawes*, 409 F.3d at 217. If

both elements of the test are satisfied, the exception applies, and there is no longer a waiver of sovereign immunity. *Id*.

        a.       **Mandatory regulations prescribing a specific course of conduct**

Defendant contends that although certain regulations, manuals, and policies applied to the planning and conduct of Robin Sage, there were no mandatory policies prescribing a specific course of conduct with respect to the four allegedly negligent acts described in paragraph 18 of Plaintiff's Complaint. (Docket No. 38 at 13.) Rather, Defendant argues that these regulations and policies only gave general guidance for the conduct of Army training and Army training exercises, and preserved discretion for the ultimate decision-makers. (*Id*.) Plaintiff, on the other hand, argues that there were mandatory regulations or policies that prescribed a specific course of action for Defendant's agents to take in connection with the four acts of negligence cited by Plaintiff. (Docket No. 39 at 11-13.)

Defendant presents the sworn declarations of several Army officials with supervisory authority over Robin Sage who generally assert that there was no specific guidance given on how to train soldiers during exercise Robin Sage. Colonel (Ret.) Charles A. King states in his declaration that until June 2003 he was the commander of the 1st Special Warfare Training Group (Airborne) (SWTG). (Docket No. 38, Ex. GE A, Declaration of Colonel (retired) Charles A. King, ¶ 1.) One of his subordinate commands was responsible for conducting Robin Sage in 2002. (*Id*.) Colonel King states that Robin Sage is "extraordinarily realistic by design" and that the successful special forces soldier is assigned

to an operational special forces detachment as a fully qualified "Green Beret" immediately following the completion of Robin Sage. (*Id.* ¶ 5.) "Neither the United States Army Special Operations Command nor the United States Army John F. Kennedy Special Warfare Center and School published any specific guidance on the conduct of Exercise Robin Sage, as it was a well established and enduring event." (*Id.* ¶ 8.) Colonel King further states that "[n]o Army regulations or policies, higher headquarters' regulations or policies, or 1st SWTG regulations or policies required" any of the four categories of actions which Plaintiff describes in paragraph 18 of his Complaint. (*Id.* ¶ 10.) Rather, any instructions regarding planning, implementing, and executing Robin Sage were "broad . . . to leave ample room for the cadre NCO to adjust to how the exercise evolved." (*Id.* ¶ 12.)

Command Sergeant Major Charles Beebe also submitted a declaration stating that he served as an instructor in the unit which conducted Robin Sage in 2002. (Docket No. 38, Ex. GE C, Declaration of Command Sergeant Major Charles Beebe, ¶ 1.) He further states that no notice was given to law enforcement agencies on February 22, 2002[1] regarding student activities because the students were on a reconnaissance mission rather than a target execution mission. (*Id.* ¶ 5.) Law enforcement agencies were contacted when their officers were anticipated to participate as role players or assist with other activities such as

---

[1] The shooting occurred on February 23, 2002. (Compl. ¶ 7.) Because the reconnaissance activity mentioned describes the activity Sergeant Phelps and 1st Lieutenant Tomeny were engaged in on February 23, the February 22 date may be a clerical error.

roadblocks. (*Id*. ¶ 3.) In addition, law enforcement agencies were notified during the exercise before students conducted missions that were in plain sight of the local populace or which included activities using pyrotechnics or blank fire. (*Id*.) Reconnaissance missions were not considered target execution missions because while conducting reconnaissance the soldiers were to remain unobserved and undetected by the enemy role-players and general populace. (*Id*.)

Finally, Sergeant Major David M. Garner states in his declaration that he served as a cadre team sergeant in 2002 with training responsibilities for Robin Sage. (Docket No. 38, Ex. GE B, Declaration of Sergeant Major David M. Garner, ¶ 1.) He further states that based on the applicable regulations, including the Standard Operating Procedure ("SOP") referring to "talking to local and county police" relied upon by Plaintiff, he understood that he had to contact and coordinate with law enforcement personnel prior to the beginning of an exercise only when the use of law enforcement personnel were expected to participate as role players and during the exercise when the students were to engage in target executions. (*Id*. ¶ 4.) Because there were no law enforcement role players for Robin Sage during January and February 2002, he did not contact local law enforcement agencies except for, on or about February 13, 2002, contacting the Robbins Police Department and, on or about February 20,

2002, informing the Moore County Sheriff's Department dispatcher that his students would be using blank ammunition to seize a rest stop on Highway 705.[2] (*Id.* ¶ 6.)

Plaintiff does not present evidence from any participant of Robin Sage, or non-participant, to dispute these assertions regarding the nature of the directions governing the execution of Robin Sage. Rather, Plaintiff relies on the language of various regulations and policies to support his case. First, Plaintiff discusses an Army manual identified as AFM 100-14. (Docket No. 39, Pl.'s Resp. at 11.) Plaintiff argues that this manual required the Army to consider "risk controls" and "life safety," and required commanders to avoid danger to civilians in their area of operations. (*Id.*) Nonetheless, the Court finds that such directives as described by Plaintiff clearly fail to prescribe a mandatory and specific course of action of the type that Plaintiff describes in paragraph 18 of his Complaint. *See Baum v. United States*, 986 F.2d 716, 721-22 n.2 (4th Cir. 1993) (finding that directions to "provide a ... safe[] and suitable approach for passenger-vehicle traffic" and to provide "[s]ubstantial railings along each side of the bridge" were "far too general" to serve as mandatory regulations within the meaning of the discretionary function exception of FTCA). Therefore, this Army manual does not establish mandatory and specific rules under the first element of the discretionary function test.

---

[2] Command Sergeant Beebe also states that MSG George C. May, another cadre team sergeant, called the Moore County Sheriff's Office on February 21, 2002 to inform them that students would engage in combat operations around the Highway 705 rest stop later that night. (Docket No. 38, Ex. GE C, ¶ 4.)

Plaintiff next argues that the Army established rules of engagement to govern Robin Sage. (Docket No. 39 at 11.) These rules purportedly "explicitly barred the disruption of normal civilian activity." (*Id.*) Again, even if this directive is considered to be mandatory, it does not prescribe a specific course of conduct that the planners of Robin Sage should have taken with respect to the four areas that Plaintiff identifies in paragraph 18 of his Complaint. *See Baum*, 986 F.2d at 722.

Plaintiff also alleges that the Army adopted additional "SOPs that greatly increased the risk of harm" following an incident on February 16, 2002 in the Town of Robbins. (Docket No. 39 at 12.) These SOPs "required Robin Sage students to resist arrest and 'kill' any civilian law enforcement they might encounter," according to Plaintiff. (*Id.*) Plaintiff appears to rely on this incident to establish Defendant's negligence. (*See id.*) However, negligence is "largely irrelevant to the discretionary function inquiry." *Baum*, 986 F.2d at 722 n.2. At any rate, even assuming that Plaintiff's allegations regarding additional SOPs are accurate, they wholly fail to show that rules were adopted which prescribe a specific course of conduct for Robin Sage planners with respect to the four areas identified by Plaintiff in paragraph 18 of his Complaint.

Finally, Plaintiff contends that Army SOPs for Robin Sage mandated that someone "[t]alk to local and county police, identify times, and areas where operations will occur." (Docket No. 39 at 12 (SOP found at Docket No. 38, Ex. GE B-1 at 24 ¶ 4).) Plaintiff contends that this language satisfies the requirement for mandatory language, describing

-10-

specific conduct, required by the discretionary function test. (Docket No. 39 at 12.) This provision appears in paragraph 4 of section 7, subsection e of F Company Standard Operating Procedure. (Docket No. 38, Ex. GE B-1.) Subsection e is entitled, "CYCLE BREAK." Command Sergeant Beebe explains in his declaration that Phase 4 training consists of three periods or cycles. (*Id*., Ex. GE C at 1.) These are: (1) cycle break and cadre train-up; (2) student training at Camp MacKall; and (3) the Field Training Exercise Robin Sage. (*Id*.) The cycle break and cadre train-up period in 2002 began on January 7 and ended on January 25.[3] (*Id*.) Robin Sage began on February 15, 2002. (*Id*.)

The language of this SOP does not speak in any fashion to the Army's duty to train exercise participants on dealing with non-exercise participants or the Army's duty to establish and brief exercise participants on non-exercise law enforcement contact procedures. Therefore, the SOP fails to establish the requisite mandatory regulations as to the last two allegedly negligent acts committed by Defendant described in paragraph 18 of Plaintiff's Complaint.

---

[3] The F Company Standard Operating Procedure reveals that during the cycle break period the cadre is involved in activities such as identifying areas of operation for the Robin Sage field exercise, locating possible targets, locating and talking with landowners adjacent to training areas, preparing land use agreements for landowners, developing the auxiliary participants in the exercise, and talking to law enforcement authorities. (Docket No. 38, Ex. GE B-1, section 7(e).) During oral argument, Government's counsel also offered that some cadre members may use this period to take leave.

The first two allegations of negligence in the Complaint involve Army officials contacting law enforcement agencies.[4] The SOP at issue tells Army personnel to "talk to" police and to "identify times and areas."[5] There is no traditional mandatory language used such as "must" or "shall." *Cf. Ochran v. United States*, 117 F.3d 495, 500-01 (11th Cir. 1997) (Even policy, statute, or regulation that indicates employee "shall" do something may leave room for policy-based judgments that fall within discretionary function exception.).

---

[4] The Court notes that the undisputed record evidence shows that Moore County Sheriff's Department personnel were told of Robin Sage activities occurring during the days leading up to February 23, 2002. (Docket No. 38, Ex. GE D at 166-68, Deposition of Ernest Lane Carter, Sheriff of Moore County, stating that just before the February 23, 2002 incident his dispatcher was notified by the Army of their upcoming attack on a bridge on Hires Mill Road.) The declaration of Command Sergeant Beebe describes other contacts regarding operations on the Highway 705 rest stop. (Docket No. 38, Ex. GE C.) However, the fact that notifications were made does not resolve the question of whether the discretionary function exception applies.

[5] Subsection "e. CYCLE BREAK" of section 7 of F Company Standard Operating Procedure (SOP) reads in part as follows:

> 4. Local Law Enforcement.
>    Talk to local and county police, identify times, and areas where operations will occur. Use the law enforcement in you're [sic] A/O for roadblocks, Intel, weapons procurement, etc. Most law officers will accommodate you. (Treat them with RESPECT)
>
> 5. Let the people know when you will arrive and when the exercise is over. Always call local law enforcement (911) prior to TGT. Execution.

(Docket No. 38, Ex. GE B-1 at 24-25.)

Even if this language were to be considered to be mandatory, it does not prescribe a *specific* course of conduct for Army personnel. *See Baum*, 986 F.2d at 720. The provision gives no direction as to how Army personnel are to "talk to" local police and how "times and areas" are to be "identified." *Cf. Ochran*, 117 F.3d at 500-01 (guidelines failed to "specify *how*" protection was to be provided; exercise of judgment necessary to determine appropriate means of doing so). Would a phone call suffice or must the contact be face-to-face? Would the identification of a Moore County neighborhood be sufficient, or did the SOP require the identification of a specific location such as the bridge over the Deep River on Highway 2? How specific must the notification be as to the time of the occurrence of the event? *Cf. Ochran*, 117 F.3d at 501 (guideline did not specify *when* information must be made available). These questions show that notwithstanding this SOP provision the Army officials retained a significant amount of discretion in complying with the direction. If the governmental action complained of "involves an element of judgment or choice," the first element of the discretionary function exception is met. *Hawes*, 409 F.3d at 217. Here, the language of this provision is far too non-specific to remove judgment and choice from the execution of the governmental action.

Finally, even if this provision were to be viewed as mandatory and to identify a sufficiently specific course of conduct, the undisputed evidence of record is that Army officials directly involved in making notifications believed that the directive applied only when local law enforcement officers were to be involved in role play or when Robin Sage

-13-

operatives were conducting a target execution.  (Docket No. 38, Ex. GE C at 2-3; Ex. GE B at 2.)  This interpretation of the SOP, taken as a whole, is reasonable.  The very SOP Plaintiff relies upon (*i.e.*, F Company Standard Operating Procedure, Docket No. 38, Ex. GE B-1 at 24 ¶ 4), entitled "Local Law Enforcement," wherein "[t]alk to . . . police" is mentioned, also describes the *use* of local law enforcement in exercises.  Paragraph 5 is closely related to paragraph 4, and that paragraph states, "[a]lways call local law enforcement (911) prior to TGT. Execution."  (*Id*. at 25.)  But the February 23, 2002 reconnaissance mission in issue in the case at bar did not involve use of local law enforcement officers or target execution.  (*Id*.)

Plaintiff argues that paragraph 4 "should be read to include all military operations undertaken during Robin Sage–including the activities of Tomeny, Phelps, and Leiber on February 23, 2002."  (Docket No. 39 at 12.)  However, "an agency's interpretation of its own regulations is entitled to substantial deference and will ordinarily be accorded controlling weight unless clearly erroneous."  *Kelly v. United States*, 924 F.2d 355, 361 (1st Cir. 1991).  The interpretation of paragraph 4 understood by Command Sgt. Major Beebe and Sgt. Major Garner is not clearly erroneous on the present record.  In fact, it is objectively reasonable.  Moreover, even assuming that Plaintiff's proffered interpretation of paragraph 4 is reasonable, it would be only one of at least two reasonable interpretations.  Faced with at least two reasonable interpretations of the paragraph, the soldiers would by necessity have used their discretion to decide which interpretation to follow.  *See Baie v. Secretary of Defense*, 784 F.2d 1375, 1377 (9th Cir. 1986) (interpretation of statute is a "plainly

discretionary administrative act the 'nature and quality' of which Congress intended to shield from liability under the FTCA"). Thus, Plaintiff has not carried his burden of persuasion on the issue of whether the "talk-to" provision of the SOP in question applies to the type of activity that he encountered on February 23, 2002. *See Williams*, 50 F.3d at 304.

Plaintiff has failed to show that mandatory, specific guidelines governed the activities of Army personnel with regard to any of the four allegedly negligent acts alleged in paragraph 18 of Plaintiff's Complaint. The first element of the discretionary function test is met.

### b. Public policy considerations

The second element of the discretionary function test examines whether the choice or judgment of the government is based on considerations of public policy. *Baum*, 986 F.2d at 720. The Fourth Circuit has stated that this requirement is consistent with the underlying general purpose of the FTCA – to balance the redress of injuries suffered through the negligence of government actors against the need to protect the government from being hobbled in the discharge of its policy-driven duties by tort lawsuits. *Id*. Public policy in this context is defined as involving considerations of economic, social, or political policy. *Hawes*, 409 F.3d at 218.

"[I]t is well established in [the Fourth Circuit] that 'when discretionary decisions are ones of professional military discretion, they are due the courts' highest deference.'" *Id*. at 220. The Fourth Circuit noted its "broad discretionary function exception jurisprudence" in

-15-

finding that a Marine's decision not to immediately complete repairs on an obstacle course beam implicated economic policy because it involved the "allocation and management of scarce military resources." *Id*. The appeals court took note that the purpose of the obstacle course was to train marines for combat. *Id*. The military equipment was "integral to the Marine Corps' policy of effectively training Marines for combat while reducing unnecessary risks." *Id*.

In this case, the declaration of Colonel King leaves no doubt that the Robin Sage exercise is integral to the training of the Army's Green Berets. (Docket No. 38, Ex. GE A.) This exercise is the culmination of 9 to 18 months of specialized training and is designed to simulate real world situations and missions. (*Id*. ¶¶ 5, 7.) Colonel King states that this exercise "has been a key factor in shaping the success of Special Forces for over 50 years." (*Id*. ¶ 7.) Immediately following successful completion of this exercise, the soldier is "subject to real world combat deployments." (*Id*. ¶ 5.)

The decisions of whether to and in what manner to advise local law enforcement agencies of Robin Sage and its details implicate the Army's policy of effectively training soldiers for combat. *See Hawes*, 409 F.3d at 218. Those decisions also implicate how the Army allocates its resources which, at the time of this incident, were scarce due to the events of September 11, 2001. (*See* Docket No. 38, Ex. GE A, ¶ 16.) Decisions surrounding whether to establish procedures for and whether and in what manner to advise and train exercise participants on encounters with non-exercise law enforcement officers and civilians

also implicate the Army's policy of effectively training its soldiers through Robin Sage and the allocation of its resources. *See Hawes*, 409 F.3d at 218. Therefore, the second element of the discretionary function test is met. *Id*.

Because both elements of the discretionary function exception are met, the actions of Defendant challenged in this action are shielded by sovereign immunity, and this Court lacks jurisdiction over Plaintiff's claims. Plaintiff's FTCA claim should be dismissed under Fed. R. Civ. P. 12(b)(1). *See Williams*, 50 F.3d at 304.

### 2. State Tort of Negligent Infliction of Emotional Distress

Defendant moves to dismiss a claim of negligent infliction of emotional distress. (Docket No. 38 at 18-19.) However, Plaintiff's Complaint sets out only one claim for relief and that is for violation of the FTCA. (Compl. at 1.) Therefore, there is no independent claim for negligent infliction of emotional distress. Relief for any such claim, if made, would be precluded by the FTCA under the analysis set forth above.

### Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (Docket No. 37) be granted and that this action be dismissed with prejudice.

/s/ P. Trevor Sharp
United States Magistrate Judge

Date: February 25, 2010

-17-